IN THE COURT OF APPEALS OF NORTH CAROLINA

COA No. 22-462

Filed 18 April 2023

New Hanover County, No. 20JA198

IN THE MATTER OF: M.B.

Appeal by respondent-mother from two orders entered by Judge J.H. Corpening, II in New Hanover County District Court—the first entered on 16 February 2022 and the second entered on 14 March 2022. Heard in the Court of Appeals 22 March 2023.

> *Karen F. Richards for New Hanover County Department of Social Services, petitioner-appellee.*

> *Parker Poe Adams & Bernstein LLP by Ashley A. Edwards for Guardian ad Litem.*

> *Jason R. Page for respondent-appellant-mother.*

FLOOD, Judge.

Velanza Batts ("Respondent-Mother") appeals from two orders; the first order (the "First Order") awarded guardianship of her minor child, Michael,[1] to her sister Leticia Batts ("Ms. Batts"), while the second order (the "Second Order") awarded legal custody to Ms. Batts and included findings regarding Respondent-Mother's progress in her case plan. After thorough review, we conclude that North Carolina was at no

---

[1] A pseudonym has been used to protect the identity of the minor child.

time Michael's home state, and thus the district court lacked the jurisdiction to enter both the First Order and the Second Order.

## I. Background and Procedural History

This case involves two separate and distinct child abuse and neglect cases involving Respondent-Mother and Michael—one in Maryland and the other in North Carolina. In the interest of cohesion and clarity, we will recount the facts of each case separately and in chronological order.

### A. The Maryland Case

On 8 November 2013, Michael was born to Respondent-Mother and father Tommie Moore, Jr., who died on 4 December 2014. For years, Michael and Respondent-Mother lived together in the Washington, D.C. area. On 2 September 2018, Respondent-Mother was arrested in Washington, D.C. for driving under the influence, resulting in Prince George's County, Maryland's Department of Social Services ("Maryland DSS") filing a Child in Need of Assistance petition. A hearing was held, and on 30 November 2018 a Maryland court entered an order in which it found the following:

> Prince George's County Police responded to a DUI driver on New Hampshire Avenue; when pulled over, the mother was abrasive and appeared under the influence. A cigarette that appeared to be dipped in PCP and half smoked was found under her car seat, as well as 6-7 grams of marijuana. The child was riding in the front passenger seat even though there was a car seat in the back. The mother was unable to answer any questions and just kept repeating what was asked of her. She was arrested and taken to Laurel Regional Hospital. The child had no known injuries, and

appeared to be fine. As there was no information available on family or anyone to care for the child, he was placed in foster care.

Based on these facts, the court concluded that, as a matter of law, Michael was a Child in Need of Assistance, that being in Respondent-Mother's care would be contrary to his welfare, and that it was not possible to return Michael to the custody of Respondent-Mother. The court ordered that Michael be placed in the care and custody of Maryland DSS and that Respondent-Mother enter into a service agreement with Maryland DSS.

Michael remained in the custody of Maryland DSS from 30 November 2018 until 8 January 2020, when, during a Permanency Planning hearing, the court found that Respondent-Mother had "done everything asked of her, is stable, and has been safely caring for [Michael] for the past 3+ months and the case should be closed." In light of those factual findings, the court ordered Michael be placed in the care and custody of Respondent-Mother. Importantly, the court included the following in its order:

> ORDERED, that the interest of the court and the Prince George's County Department of Social Services in the above-captioned Child in Need of Assistance matter is terminated; and it is further
> . . .
> ORDERED, that the above-captioned Child in Need of Assistance matter is closed statistically.

The order concluded by stating that it would remain "in effect until the minor respondent child reached the age of 18, unless revised or superseded by a court of competent jurisdiction."

On 8 January 2020, the court entered its order (the "Maryland Custody Order"), which terminated the matter, and Michael was reunited with Respondent-Mother.

## B. The North Carolina Case

On 14 October 2020, Respondent-Mother was seen intoxicated at a gas station in Kure Beach, North Carolina. Later that evening, Kure Beach police officers responded to a call and found that Respondent-Mother, who was highly intoxicated, had run her truck into a fence at a beach access. Michael was sitting unsecured in the front passenger seat, despite having an appropriate car seat available. The officers located in the car a partially empty fifth of Crown Royal, THC, and drug paraphernalia. Respondent-Mother was arrested for DWI, resisting arrest, possession of marijuana, possession of drug paraphernalia, and child abuse. The following day, on 15 October 2020, an order for nonsecure custody was entered by Judge Corpening in New Hanover County, North Carolina. This order placed Michael in the temporary emergency custody of New Hanover County Department of Social Services ("North Carolina DSS").

From 15 October 2020 until 1 December 2020, Michael was placed in a foster home in Wilmington, North Carolina. Respondent-Mother testified that during this time, she was staying at a hotel and would bring a scooter to get around Wilmington. North Carolina DSS worked on finding a kinship placement for Michael and eventually approved placement with Michael's maternal cousins, Keith and Darlene

Leake in Greensboro, North Carolina. On 1 December 2020, Michael was moved to Greensboro and, around that time, Respondent-Mother reports that she moved back to Washington, D.C.

On 8 March 2021, a dispositional hearing was held in New Hanover County with Judge Corpening presiding. At the hearing, both the Guardian ad Litem (the "GAL") and the social worker presented their reports to the court. The GAL's report stated that Respondent-Mother "attended all of the scheduled visits when they were in Wilmington and continues to make a weekly drive to Guilford County from Washington, DC to spend time with [Michael]. She visits [Michael] each day of her two to three day visits." The social worker's report stated, "[Respondent-Mother] is currently residing in Washington, D.C. If [Michael] is placed in Maryland, this will present [Respondent-Mother] with the opportunity to engage in more frequent visitations with [Michael]." Additionally, the social worker noted in her report that Respondent-Mother "has a North Carolina Driver's License and her car is currently registered in North Carolina."

Following the hearing, Judge Corpening entered an Order on Adjudication and Disposition which contained the following findings of fact by clear and convincing evidence:

> 13. That Respondent-Mother has made building a rapport with her difficult due to presenting as manipulative, confrontational, and dishonest with the Department, Guardian ad Litem, and collateral contacts. There has been some confusion as to where Respondent-Mother resides. Respondent-Mother has reported

that while the Juvenile was placed in Wilmington, N.C. she was residing in Halifax County, N.C. Now that the Juvenile is placed with family in Greensboro, N.C., she has moved back to Washington, D.C. Respondent-Mother reported that she obtained her previous full-time position back at the fitness center, but has not provided the Department with the name of her employer. The Department has been unable to verify her employment and income.

On 19 May 2021, Mr. and Mrs. Leake reported to North Carolina DSS that they were no longer willing to supervise visitation with Respondent-Mother because she continued to show up unannounced, was disrespectful, would tell Michael he did not have to listen to them, and would not accept when they said they were not available for a visit or phone call. Due to the tenuous relations between Respondent-Mother and the Leake family, North Carolina DSS began exploring alternative kinship placements.

During the 9 June 2021 hearing, Judge Corpening made the following findings of fact by sufficient and competent evidence:

> 15. That Respondent-Mother's permanent address is in Washington, D.C. and she reports that she stays with a relative when she visits the Juvenile in Guilford County, North Carolina.
>
> 19. That the Department is requesting placement with the Maternal Aunt. It would put [Michael] *closer to home*, allow family placement that he already has a relationship with, and would allow Respondent-Mother to enroll and continue to participate in her services once the Department is no longer involved with the family. (emphasis added).
>
> 22. That the current placement is appropriate and in the Juvenile's best interest but placement with Maternal Aunt is more appropriate at this time due to the conflict between the

Leakes and Respondent-Mother as well as the distance between [Michael's] placement and his *permanent home.* (emphasis added).

Based upon those findings of fact, the court concluded that "[North Carolina DSS] has authorization to place [Michael] in Maryland with Maternal Aunt, Ms. Batts, immediately." On 10 June 2021, Michael was moved from the kinship placement with the Leakes in Guilford County, North Carolina to a different kinship placement with Ms. Batts in Prince George's County, Maryland.

Once back in Maryland, Michael continued to have visitations with Respondent-Mother, supervised by Ms. Batts. After an incident on 3 July 2021, however, the relationship between Respondent-Mother and Ms. Batts deteriorated, and Ms. Batts told North Carolina DSS that she was no longer willing to supervise visitations.

Social worker Samantha Muse described this incident in a report to the court filed on 30 August 2021, stating:

> On July 3, 2021, [Ms. Batts] reported that [Respondent-Mother] came over to her home to have a visitation with [Michael]. [Respondent-Mother] reported she was leaving for the day and said her goodbyes to [Michael]. It is reported that at approximately 10:00 PM, [Respondent-Mother] could be heard screaming for [Michael] from outside. [Respondent-Mother] was climbing the building to [Ms. Batts'] balcony and was able to make it to the balcony and inside the apartment. [Respondent-Mother] was escorted out of the door by Mr. Pinkey and was informed that she could no longer have visitations at their home.
>
> On July 4, 2021, [Ms. Batts] reported that [Respondent-Mother] came back to her house. Mr. Pinkey and [Respondent-

Mother] got into a physical altercation because he would not let her come into his home. It was reported that they were fighting with a hammer. [Ms. Batts] reported that she intervened and was able to get the hammer. [Ms. Batts] reported that her sister appeared to be under the influence.

On 3 February 2022, New Hanover County District Court held a permanency planning hearing to evaluate the placement of Michael with Ms. Batts in Prince George's County, Maryland. That hearing resulted in two orders—the First Order, entered on 16 February 2022, awarded Ms. Batts guardianship of Michael, and the Second Order, entered 14 March 2022, made further findings of fact regarding Respondent-Mother's progress in her case plan. Following the permanency planning hearing, Judge Corpening entered the Second Order, which was filed on 14 March 2022. In it the court made the following finding of fact by clear, cogent and convincing evidence:

16. . . . [Respondent-Mother] has lived in Washington, D.C., for the last three years and currently resides in a two-bedroom apartment. Respondent-Mother has been having unsupervised visits and overnights since the Juvenile was placed in Maryland with Maternal Aunt. Respondent-Mother is employed at U.S. Fitness as a lifeguard. She has been employed there since August of 2018 and is paid twelve dollars an hour.

The court expressed great concern with the frequency of the unsupervised visits between Respondent-Mother and Michael. North Carolina DSS learned of these visits in January 2022 and "immediately educated [Ms. Batts] about why this could not occur and asked for the unsupervised visits and overnights to stop." The court noted in its findings of fact,

- 8 -

51.     That due to the distance, the denied ICPC, and the lack of information provided by the Maternal Aunt and Respondent-Mother about visitations, [North Carolina DSS] is conflicted. If this had occurred in North Carolina, [North Carolina DSS] would have requested that the Juvenile return to a foster care placement to resolve the issues. To do so at this time though, would remove the Juvenile from a relative placement with consistent visitation, . . . and [North Carolina DSS] does not find that in the best interest of the child, *in a state where no one continues to reside.*

(emphasis added).

Following the entry of the Second Order on 14 March 2022, Respondent-Mother timely filed a notice of appeal that referred only to the Second Order. Subsequently, Respondent-Mother was appointed Appellate Counsel. Counsel for Respondent-Mother filed a petition for writ of certiorari on 11 July 2022, asking this Court to review the First Order in addition to the Second Order under a theory that both orders were based on the same underlying facts.

## II. Jurisdiction

As an initial matter, this Court will address Respondent-Mother's petition for a writ of certiorari to review the First Order. In a juvenile matter, final orders of a lower court may be appealed directly to this Court when that order changes the legal custody of a juvenile. N.C. Gen. Stat. § 7B-1001(a)(4) (2021). Further, the North Carolina Rules of Appellate Procedure permit a writ of certiorari to be issued in this Court's discretion "when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C.R. App. P. 21(a)(1). Finally, this Court has previously

noted the "importance of issues involving the relations between parents and their children" as a factor when considering a petition for writ of certiorari in juvenile cases. *In re K.C.*, 199 N.C. App. 557, 558, 681 S.E.2d 559, 561 (2009) (in which this Court permitted the review of an adjudication order and disposition order, despite the initial notice of appeal failing to reference the disposition order).

Here, the First Order and the Second Order both resulted from the same 3 February 2022 permanency planning hearing. In the First Order, which was entered one month prior to the Second Order, Judge Corpening noted that "due to the confidential nature of the files and proceedings of the Juvenile Court this separate order is necessary to authorize [Ms. Batts] to act on behalf of the above-named Juvenile and as such, has the full force and effect of the original Court Order upon which it is based." Respondent-Mother timely filed an appeal from the Second Order and requested an appointment of counsel for her appeal. While Respondent-Mother's notice of appeal failed to include mention of the First Order, the facts in the Record clearly show that both orders were based on the same underlying facts. Because the legal custody of a juvenile hangs in the balance, this Court grants Respondent-Mother's petition for writ of certiorari and proceeds on the merits. *See K.C.* 199 N.C. App. At 558, 681 S.E.2d at 561.

### III. Issues

The issues before this Court are whether the district court: (1) had the requisite subject matter jurisdiction to enter the First Order and Second Order, (2) reached

conclusions that were supported by competent evidence, and (3) erred when it granted guardianship to Ms. Batts. We find the jurisdictional issue is dispositive of all three.

## IV. Analysis

On appeal, Respondent-Mother argues the First and Second Orders should be vacated because the district court lacked subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (the "UCCJEA"), as Maryland is Michael's home state, and the Maryland Custody Order was a previous child-custody determination. Conversely, North Carolina DSS argues that North Carolina became Michael's home state when its temporary emergency jurisdiction "'morphed' into a final determination on continued subject matter jurisdiction" under N.C. Gen. Stat. § 50A-204(b). We agree with Respondent-Mother.

### A. Standard of Review

"Whether the trial court has jurisdiction under the UCCJEA is a question of law subject to *de novo* review." *In re J.H.*, 244 N.C. App. 255, 260, 780 S.E.2d 228, 233 (2015).

### B. The UCCJEA

Article Two of the UCCJEA has been adopted into North Carolina's General Statutes in an attempt to "avoid jurisdictional competition and conflict with the courts of other States in matters of child custody. . . ." N.C. Gen. Stat. § 50A-101(1) cmt. (2021). The jurisdictional requirements of the UCCJEA, therefore, must be met before a court of this State takes any action pertaining to custody determinations.

N.C. Gen. Stat. §§ 50A-201, 203, 204.  If a court of this State lacks the jurisdiction to decide on a matter, "then the whole proceeding is null and void, *i.e.*, as if it had never happened."  *In re K.U.-S.G.*, 208 N.C. App. 128, 131, 702 S.E.2d 103, 105 (2010) (quoting *Hopkins v. Hopkins*, 8 N.C. App. 162, 169, 174 S.E.2d 103, 108 (1970)).

### C. Home State Jurisdiction

The UCCJEA defines home state as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding."  N.C. Gen. Stat. § 50A-102(7).  N.C. Gen. Stat. Section 50A-102(5) defines "commencement" for purposes of the UCCJEA as "the filing of the first pleading in a proceeding."  *Id*. § 50A-102(5); *In re J.H.*, 244 N.C. App. 255, 264, 780 S.E.2d 228, 236 (2015).

In the instant case, a *de novo* review of the record shows that Maryland was the home state of both Respondent-Mother and Michael.  *See id.* at 260, 780 S.E.2d at 233.  The uncontroverted evidence in the Record shows that from his birth on 8 November 2013 until 14 October 2020, Michael lived his entire life in Washington, D.C. and the surrounding suburbs of Maryland.  Michael and Respondent-Mother lived in Maryland for at least six months prior to North Carolina DSS taking Michael into temporary emergency custody; further, Michael and Respondent-Mother lived in Maryland for at least six months prior to Maryland DSS taking Michael into custody in September 2018.  Perhaps most pointedly, there are several instances throughout the Record where the district court refers to Maryland as Michael's home.  For

example, the district court stated that placement with Ms. Batts in Maryland would "put [Michael] closer to home" and that placement with Ms. Batts would be more appropriate due to "the distance between [Michael's] placement and his *permanent home*." (emphasis added). These facts tend to show that, regardless of whether the Maryland Custody Order should be considered an initial custody determination under N.C. Gen. Stat. Section 201, Michael and Respondent-Mother lived in Maryland for at least six months prior to the commencement of either the Maryland or North Carolina cases. For those reasons, we hold Maryland is Michael's home state under the UCCJEA.

### D. Initial Child-Custody Determination

The UCCJEA defines an "initial determination" as "the first child-custody determination concerning a particular child." N.C. Gen. Stat. § 50A-102(8). A child-custody determination is defined as "a judgment, decree or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child." N.C. Gen. Stat. § 50A-102(3); *see also id.* cmt. (noting that a child-custody determination under the UCCJEA "encompasses *any* judgment, decree, or other order which provides for the custody of, or visitation with, a child[.]") (emphasis added). If there exists a home state, then that state is entitled to make initial child-custody determinations. N.C. Gen. Stat. § 50A-201(a)(1).

As concluded above, Maryland is Michael's home state and therefore possessed the jurisdiction to make an initial child-custody determination. Further, the

Maryland Custody Order is properly considered an initial child-custody determination because it provided that Michael be returned to the full legal and physical custody of Respondent-Mother. *See* N.C. Gen. Stat. § 50A-201(a)(1).

## E. Maryland's Exclusive, Continuing Jurisdiction

North Carolina DSS argues that the Maryland Custody Order cannot properly be considered an initial child-custody determination because the clear language of the order stated the matter was "terminated" which, in turn, "terminated" Maryland's jurisdiction over Michael and Respondent-Mother. We disagree.

A child's home state retains

> 'exclusive, continuing jurisdiction over the determination' until either (1) there is no longer a significant relationship between any of the parties and the state, and there is no longer any substantial evidence available in the state 'concerning the child's care, protection, training, and personal relationships,' or (2) none of the parties reside in the state.

*Hamdan v. Freitekh*, 271 N.C. App. 383, 387, 844 S.E.2d 338, 341 (2020) (citing N.C. Gen. Stat. § 50A-202(a)(1)–(2)).

According to North Carolina DSS's own brief, "the Maryland Courts were clear that the [Maryland Custody Order] remained in effect until the minor respondent child reached the age of eighteen[.]" The Record also clearly shows that both Michael and Respondent-Mother have a significant relationship with Maryland and that substantial evidence relating to their custody matter can be found within the state. Michael has lived all but nine months of his life in Maryland. The district court made

findings of fact supported by clear, cogent, and convincing evidence that Michael currently lives in a kinship placement in Maryland; for the past three years Respondent-Mother has lived in a two-bedroom apartment in Washington, D.C.; and Respondent-Mother has worked as a lifeguard at a fitness center in Washington, D.C. since August 2018. All of these facts, taken together, point to the same conclusion: Maryland has exclusive, continuing jurisdiction over the parties because Michael and Respondent-Mother have lived there, continue to live there, and significant evidence about their case exists there.

### F. North Carolina's Temporary Emergency Jurisdiction

North Carolina DSS argues that the conditions set out in N.C. Gen. Stat. § 50A-204(b) were met and thus, North Carolina's temporary emergency jurisdiction "morphed" into a final determination of jurisdiction, making North Carolina Michael's new home state. We disagree.

North Carolina may exercise "temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse." N.C. Gen. Stat. § 50A-204(a). Once in temporary emergency custody, a determination as to whether a previous child-custody determination exists must be made. *See generally* N.C. Gen. Stat. §50A-204. Under section 50A-204(b), if no previous child-custody determination had been made, then a child-custody determination made under temporary emergency jurisdiction "becomes a final

determination . . . and this State becomes the home state of the child." N.C. Gen. Stat. § 50A-204(b). If, however, a previous child-custody determination *had* been made, then sections 50A-204(c)–(d) instruct North Carolina courts to specify the duration of its jurisdiction in its order and communicate with the court of the child's home state to resolve the emergency. N.C. Gen. Stat. § 50A-204(c)–(d).

There is no disputing the emergent circumstances under which Michael came into the temporary emergency custody of North Carolina DSS. Respondent-Mother's belligerence in Kure Beach on 14 October 2020 undoubtedly warranted intervention to protect Michael, and North Carolina DSS appropriately exercised temporary emergency jurisdiction. *See* N.C. Gen. Stat. § 50A-204. It is North Carolina DSS's contention, however, that the Maryland Custody Order was *not* a previous child-custody determination and therefore Maryland did not have jurisdiction over the parties. North Carolina DSS further argues that, in the absence of a previous child-custody determination, this State's temporary emergency jurisdiction "morphed" into a final determination and North Carolina became Michael's home state. *See* N.C. Gen. Stat. § 50A-204(b). As we concluded above, the Maryland Custody Order is a previous child-custody determination, and therefore section 50A-204(b) is neither controlling nor relevant to Michael's case. Instead, under sections 50A-204(c)–(d), the district court had an affirmative duty to follow the parameters set forth for addressing further custody determinations when a child is taken into temporary emergency jurisdiction in our state and a previous custody determination had been

made by another state. *See* N.C. Gen. Stat. § 50A-204(c)–(d); *see also In re Brode*, 151 N.C. App. 690, 695–96, 566 S.E.2d 858, 862 (2002) (holding that, after being noticed of a prior custody order and upon entry of a temporary custody order, the trial court should have immediately contacted the state in which the prior custody order was entered to determine their willingness to assume jurisdiction.).

There is no evidence in the Record showing North Carolina and Maryland courts communicated to resolve the emergency, or to determine a period of the duration of the temporary order. *See* N.C. Gen. Stat. § 50A-204(c)–(d). The facts do show, however, that the district court knew North Carolina DSS had been in contact with Maryland DSS on several occasions. Additionally, both the Maryland Custody Order and history of Maryland DSS's case was admitted into evidence by the district court. These facts lead this Court to conclude that the district court over-extended its temporary emergency jurisdiction, despite knowledge of a previous child-custody determination having been made.

## **V. Conclusion**

The district court lacked the jurisdiction to enter both the First Order and the Second Order, as Maryland has jurisdiction over both Respondent-Mother and Michael; therefore, we vacate both the First Order and Second Order and remand to the district court for proceedings consistent with this opinion.

VACATED AND REMANDED.

Judges TYSON and GRIFFIN concur.